LORD M PHIBONACCII
18612 WILLARD ST
RESEDA CA 91335
**EMAIL:** LORDESQ@ICLOUD.COM
**PHONE:** (818) 438-9998

*PLAINTIFF, IN PROPIA PERSONA*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

CENTRAL DISTRICT STANLEY MOSK COURTHOUSE

| | |
|---|---|
| LORD MAISON PHIBONACCII,<br><br>Plaintiffs,<br><br>v.<br><br>DIRECTOR, CALIFORNIA DEPARTMENT OF MOTOR VEHICLES, in official capacity only; ELIZABETH G. HUMPHREYS, in her individual capacity; JENNIFER BERRY, in her individual capacity; GAIL MAIORANA, in her individual capacity; JOSEPH CHAPMAN, in his individual capacity; MICHAEL CRAIG BREMER, in his individual capacity; SERGEANT JOHN J. BARTOLONE #319, in his individual capacity; DOES 1–10, inclusive<br><br>Defendants. | **Case No.** 2:25-CV-09270<br>**FIRST AMENDED COMPLAINT (1) 42 U.S.C. § 1983 — Procedural Due Process / Ultra Vires Record-Based Deprivations (2) Declaratory Relief (28 U.S.C. § 2201) (3) Injunctive Relief (28 U.S.C. § 2202)**<br><br>**JURY TRIAL DEMANDED**<br><br>Judge: Hon. Stanley Blumenfeld Jr.<br>Complaint filed: 11/17/2025 |

COMES NOW Plaintiff LORD MAISON PHIBONACCII ("Plaintiff"), and only Plaintiff in this action, appearing pro se and in his individual capacity, and for his First Amended Complaint alleges as follows:

## I.
## INTRODUCTION

1.
This is a civil-rights action challenging a DMV enforcement and record-keeping sequence that deprived Plaintiff of protected property and liberty interests through record-driven actions taken without constitutionally adequate notice and opportunity to be heard. The case involves one VIN and three distinct transactions that DMV

FIRST AMENDED COMPLAINT

1

collapsed into a single "consumer victim" story, plus later ownership/registration record defects that DMV processed and then maintained during Plaintiff's bonded-title and dealer wind-down posture without lawful authorization or meaningful process. See Mathews v. Eldridge, 424 U.S. 319, 333–35 (1976); Zinermon v. Burch, 494 U.S. 113, 135–39 (1990). The vehicle at issue is a 2016 BMW i8, VIN WBY2Z2C52GV675765 (the "BMW i8"). In 2019–2020, DMV officials pursued a dealer-enforcement case against Plaintiff and his dealer entity 3RAW INC (Dealer License / Special Plates No. 98813) and simultaneously maintained DMV title/registration records for the BMW i8 in a manner that created and perpetuated adverse ownership inferences. Those DMV-created records foreseeably drove collateral consequences, including bond/collection reliance, insurance-claims positioning, criminal exposure, and reputational harm. See Paul v. Davis, 424 U.S. 693, 708–10 (1976).

**2.**

DMV's Accusation (In re 3RAW Inc., Case No. 20-02069; DMV Investigations/AIMS Case No. 19M3L26883) pleads multiple dated events (including July 6, 2019; July 11, 2019; August 7, 2019; and November 9, 2019). Plaintiff alleges those dates reflect not one clean retail sale, but a multi-transaction chain. DMV nevertheless proceeded as if a single completed "consumer sale" occurred to a single victim, while failing to produce the triggering complaint that purportedly created DMV jurisdiction and scope. Plaintiff alleges that missing complaint is a jurisdictional fact, and its absence deprived him of a meaningful ability to test timeliness, standing, scope, and substance. See Mathews, 424 U.S. at 333–35; Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542–46 (1985). Plaintiff alleges there were three separate transactions involving the same VIN:

    **a.**    Transaction 1 (July 6, 2019) — commercial attempt involving THE WRAP DISTRICT INC ("Wrap District") that was not approved / not funded and was unwound ("wind-back") on July 6, 2019, returning the BMW i8 to 3RAW INC / Plaintiff inventory.

    **b.**    Transaction 2 (July 10–11, 2019) — a conditional delivery to non-party Mickey Lacoste contingent on financing approval; credit was denied; Lacoste refused to return the vehicle.

    **c.**    Transaction 3 (November 9, 2019) — a conditional agreement between Plaintiff and non-party Nisim Zvily in which a substantial balance remained outstanding (approximately $62,000), confirming that Zvily was at most a conditional counterparty with continuing payment obligations, not a fully paid bona fide "new owner."

**3.**

DMV's own Accusation references a specific Report of Sale ("ROS") for the BMW i8. In DMV's file, that ROS is tied to Wrap District and its principal, Arash Bagherabadi, including Mr. Bagherabadi's California driver-license number as the

FIRST AMENDED COMPLAINT

2

representative for the corporate buyer. The name "Mickey Lacoste" appears on ROS-related paperwork only in a non-buyer capacity. DMV knew or should have known that the ROS showed an authorized corporate buyer (Wrap District / Arash), not Lacoste, and that DMV nevertheless reconstructed the narrative to treat Lacoste as the "consumer buyer/victim" for enforcement purposes. See Bell v. Burson, 402 U.S. 535, 539–40 (1971). In early 2020, Plaintiff pursued bonded-title correction for the BMW i8 and, on or about February 21, 2020, voluntarily presented the BMW i8 to LAPD Topanga Division, where the vehicle was confirmed recovered and released back to Plaintiff with no impound, hold, or arrest. Plaintiff then drove the BMW i8 from Los Angeles to Las Vegas with the intention of returning the vehicle to Manheim. Plaintiff alleges that despite this bonded-title posture, dealer wind-down posture, and law-enforcement clearance, DMV processed and then maintained adverse ownership/registration record activity (including a February 26, 2020 "title issued or updated – new owner reported" entry at the Sherman Oaks DMV field office) while Plaintiff was in Las Vegas—without producing lawful authorization instruments bearing his informed consent, without observing DMV's own rules for dealers going out of business, and without providing Plaintiff any meaningful pre-deprivation opportunity to contest the record change.

4.

During this broader dispute period, while he had physical possession of the BMW i8, non-party Zvily submitted insurance claims to Interinsurance Exchange of the Automobile Club ("AAA") alleging that "his" BMW i8 had been stolen and/or damaged, even though Plaintiff remained the true owner in a title-dispute posture and had not authorized those claims. Later, after DMV processed the February 26, 2020 "new owner reported" entry, law enforcement and courts in Nevada treated Plaintiff as someone attempting to steal a vehicle titled to Zvily, rather than as a dealer in an unresolved ownership dispute.

5.

Plaintiff seeks:

 **(a)** damages against DMV officials in their individual capacities for personal participation in procedural due-process deprivations under 42 U.S.C. § 1983; and

 **(b)** prospective declaratory and injunctive relief against the DMV Director in official capacity to correct and/or annotate DMV records, to require constitutionally adequate procedures for disputed ownership/title entries (especially in bonded-title dispute postures), and to halt ongoing reliance on defective DMV decisions and records. See Ex parte Young, 209 U.S. 123, 155–60 (1908); 28 U.S.C. §§ 2201–2202.

## II.

### JURISDICTION AND VENUE

6.

This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under the Constitution and laws of the United States, including 42

FIRST AMENDED COMPLAINT

3

U.S.C. § 1983 and the Fourteenth Amendment. This Court has jurisdiction under 28 U.S.C. § 1343(a)(3)–(4) because this action seeks to redress deprivations, under color of state law, of rights secured by the Constitution and federal law. This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201–2202 and injunctive relief under its equitable powers. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this District, including DMV investigations and enforcement activity, DMV record-keeping and title/registration actions, and Plaintiff's LAPD Topanga clearance in Los Angeles County.

## III.
## PARTIES

7.
Plaintiff LORD MAISON PHIBONACCII ("Plaintiff") is an individual residing in Los Angeles County, California. At relevant times, Plaintiff operated and/or qualified 3RAW INC as a licensed California dealer associated with dealer license and special plates No. 98813.

8.
Defendant DIRECTOR, CALIFORNIA DEPARTMENT OF MOTOR VEHICLES ("DMV Director") is sued in official capacity only for prospective declaratory and injunctive relief. The DMV Director is responsible for DMV record-keeping systems, occupational-licensing policies, and procedures governing disputed title/registration entries.

9.
Defendant ELIZABETH G. HUMPHREYS was, at relevant times, Chief of the Occupational Licensing Branch, Licensing Operations Division, DMV Legal Affairs. She signed the Accusation in In re 3RAW Inc., Case No. 20-02069. She is sued in her individual capacity.

10.
Defendant JENNIFER BERRY was, at relevant times, Assistant Chief Counsel, DMV Legal Affairs Division, listed as "Attorney for Complainant" on the Accusation. She is sued in her individual capacity.

11.
Defendant GAIL MAIORANA was, at relevant times, Attorney III, DMV Legal Affairs Division, listed as "Attorney for Complainant" on the Accusation. She is sued in her individual capacity.

12.
Defendant JOSEPH CHAPMAN was, at relevant times, Assistant Chief Counsel, DMV Legal Affairs Division. He signed the default Decision and Order revoking 3RAW INC's dealer license and special plates No. 98813. He is sued in his individual capacity.

FIRST AMENDED COMPLAINT

4

**13.**

Defendant MICHAEL CRAIG BREMER was, at relevant times, a DMV Investigations officer in the Los Angeles Metro District and investigator on DMV Investigations/AIMS Case No. 19M3L26883. He is sued in his individual capacity.

**14.**

Defendant SERGEANT JOHN J. BARTOLONE #319 was, at relevant times, a Sergeant with DMV Investigations, Los Angeles Metro District, and author of an October 8, 2019, letter to non-party Lacoste providing bond information and directing him toward a bond claim. He is sued in his individual capacity.

**15.**

DOES 1–10 are additional DMV employees, supervisors, records personnel, and/or contractors who processed, approved, altered, or maintained adverse title/registration entries for the BMW i8 and/or participated in enforcement steps without constitutionally adequate notice and opportunity to be heard. Plaintiff will amend to substitute true names and capacities when ascertained.

**IV.**

**STATE ACTION / COLOR OF LAW AND PROSPECTIVE RELIEF**

**16.**

At all relevant times, Defendants Humphreys, Berry, Maiorana, Chapman, Bremer, Bartolone, and Does 1–10 acted under color of state law within the meaning of 42 U.S.C. § 1983 because they exercised power "possessed by virtue of state law and made possible only because [they were] clothed with the authority of state law," including: opening and running DMV investigations, issuing and prosecuting the Accusation, causing entry of default discipline revoking dealer license/plates, issuing official bond-guidance letters, and processing/maintaining DMV title/registration records for VIN WBY2Z2C52GV675765. See West v. Atkins, 487 U.S. 42, 49–50 (1988). Plaintiff does not seek damages from the State or the DMV itself. He seeks damages only from DMV officials in their individual capacities for their personal participation in constitutional deprivations and seeks prospective declaratory and injunctive relief against the DMV Director in official capacity to halt ongoing violations and correct continuing record-based harm. See Ex parte Young, 209 U.S. at 155–60.

**V.**

**FACTUAL ALLEGATIONS**

**A.**

**Background: Dealer Licensing, Suspension, and DMV Oversight**

**17.**

At all relevant times, Plaintiff, through 3RAW INC, held a California dealer license and special plates No. 98813 and was subject to DMV oversight, including occupational-licensing enforcement and record-keeping systems (Quick Tags/ROS and title/registration processing). In or about September 2019, DMV suspended

FIRST AMENDED COMPLAINT

3RAW INC's dealer license on the theory that Plaintiff had "abandoned" the dealership location. DMV's abandonment/suspension determination placed the dealership into a wind-down posture and, under DMV's own rules, made it logistically impossible to conduct new retail sales through the suspended dealer channel without compliance with dealer-going-out-of-business procedures and related safeguards. DMV's enforcement case (In re 3RAW Inc., Case No. 20-02069; AIMS/Investigations Case No. 19M3L26883) arose from DMV's decision to treat a dispute involving the BMW i8 as a consumer-victim "sale fraud" matter, even though the objective record history involved multiple transactions, a corporate ROS buyer (Wrap District), a denied conditional borrower (Lacoste), a later conditional agreement (Zvily), a suspended dealer license, and a known dispute/bonded-title posture that did not fit a single consumer sale.

**B.**

**The Three Transactions (DMV's "One-Sale" Narrative Is Record-Inconsistent)**

**Transaction 1 July 6, 2019: Wrap District Commercial Attempt (Not Approved) and Wind-Back**

18.

On or about July 6, 2019, the BMW i8 entered a commercial transaction attempt involving THE WRAP DISTRICT INC ("Wrap District"). The DMV Accusation itself references a specific Report of Sale ("ROS") for this transaction and identifies Wrap District, together with an individual identified as Arash (full name and California driver-license number shown on the ROS), as the buyer on that ROS—not Mickey Lacoste. Plaintiff alleges this shows DMV's own charging document ties the ROS to a commercial Wrap District / Arash deal, not a consumer sale to Lacoste.

19.

The ROS for the July 6, 2019, transaction lists Mickey Lacoste only in a non-buyer capacity (for example, as a contact or annotation) and does not identify him as the purchaser of record. DMV's own ROS, as quoted and relied upon in the Accusation, thus confirms that the July 6 transaction was a Wrap District / Arash commercial attempt rather than a consumer sale to Lacoste. The July 6, 2019, Wrap District transaction was not approved and did not fund. Plaintiff alleges it was unwound ("wind-back") on July 6, 2019, returning the BMW i8 to 3RAW INC / Plaintiff inventory. As of that date, any ROS/Quick Tags activity tied to the Wrap District / Arash commercial attempt should have been treated as voided/withdrawn. Because the July 6, 2019, Wrap District / Arash ROS was tied to a commercial buyer and was then unwound, the operative status of the BMW i8 reverted to dealer inventory, not a completed consumer retail sale. DMV's later characterization of this ROS as part of a "consumer victim" sale to Lacoste is inconsistent with the ROS itself and with DMV's own Accusation.

**Transaction 2 July 10–11, 2019: Lacoste Conditional Delivery**

FIRST AMENDED COMPLAINT

**(Credit Denied) and Refusal to Return**

**20.**

On or about July 9–10, 2019, after the Wrap District / Arash wind-back, Mickey Lacoste formally applied for financing for the BMW i8 through standard dealer credit-application channels. Plaintiff alleges this was a separate, conditional transaction in which Lacoste's ability to purchase the BMW i8 was expressly contingent on credit approval. During this period (July 10–11, 2019), Plaintiff entered into a separate conditional-delivery arrangement with Lacoste, allowing him to possess the BMW i8 temporarily while his credit application was being processed. The conditional delivery was expressly subject to financing approval and to standard conditional-delivery rules; it was not a completed sale, and no title documents were lawfully transferred to Lacoste. After Plaintiff submitted Lacoste's credit application, financing was denied. There was no funded retail-installment contract, no assignment, and no lawful transfer of title to Lacoste. Under ordinary dealer practice and DMV's own regulatory framework, once credit was denied, Lacoste had no right to retain the BMW i8 and was required to return the vehicle. Lacoste instead refused to return the BMW i8 and continued to hold and control it despite lack of approval and lack of title. On or about September 6, 2019, Plaintiff reported the BMW i8 stolen/embezzled to law enforcement after Lacoste's refusal to return the vehicle. Vehicle-history data later reflected a theft report in early September 2019 followed by a recovery later that month, aligning with Plaintiff's stolen-vehicle report and recovery chronology.

**Transaction 3 November 9, 2019: Zvily Conditional Agreement;
$62,000 Remaining**

**21.**

On or about November 9, 2019, Plaintiff and non-party Nisim Zvily entered into a conditional agreement concerning the BMW i8 in which a substantial balance remained outstanding (approximately $62,000). The agreement reflected that any final change of ownership was contingent on completion of payment and related conditions. Plaintiff will attach a redacted copy of the November 9, 2019, agreement (with driver-license images, numbers, dates of birth, and addresses redacted) as an exhibit. Plaintiff alleges this agreement is inconsistent with any portrayal of Zvily as a fully paid bona fide "owner," and supports Plaintiff's claim that later adverse ownership/registration entries (including "Owner 4 / new owner" type entries) were unauthorized or defective.

**C.**

**DMV Investigation, Accusation, and the Missing Complaint
(Jurisdictional Fact)**

**22.**

DMV Investigations opened and operated a case identified as AIMS/Investigations Case No. 19M3L26883. DMV proceeded on a theory that it was acting based on a "consumer complaint" and a consumer-victim posture, while at the same time relying

FIRST AMENDED COMPLAINT

on a ROS that, on its face, identifies Wrap District and Arash—not Lacoste—as the buyer. The DMV Accusation expressly cites the July 6, 2019 ROS as the operative transaction document, including the ROS number and buyer information. The ROS itself shows Wrap District and Arash (with Arash's California driver-license number) as the buyer, and only references Lacoste in a peripheral way. Plaintiff alleges this makes DMV's re-characterization of the matter as a "consumer sale" to Lacoste internally inconsistent with its own cited exhibit. On or about October 8, 2019, Defendant Sergeant Bartolone sent an official letter to Lacoste referencing the investigation, asserting that DMV had determined violations in connection with a "sale," and providing Hudson Insurance Company bond information so that Lacoste could pursue a bond claim. That letter memorialized DMV's assumption that Lacoste was the "buyer/victim" and steered him into a monetary-recovery pathway grounded in DMV's enforcement posture, even though DMV's own ROS showed a Wrap District / Arash commercial deal that had already been unwound. DMV Occupational Licensing subsequently issued an Accusation in In re 3RAW Inc., Case No. 20-02069, signed by Humphreys and prosecuted by Berry and Maiorana as "Attorneys for Complainant," and later issued a default Decision and Order signed by Chapman revoking 3RAW INC's dealer license and special plates No. 98813—all without ever reconciling the discrepancy between

  **(a)** the ROS they cited (Wrap District/Arash) and

  **(b)** the "consumer victim" narrative they advanced (Lacoste).

**23.**

DMV's narrative—and the bond/Accusation paperwork—presupposes that the Department acted "in response to a complaint" related to the BMW i8 and/or associated bond transaction. Yet nowhere in the Accusation, Decision, or certified record does DMV identify the actual complaint that supposedly triggered its involvement—no date, no complainant, and no description of what was alleged. In this posture, the complaint functions as a jurisdictional cornerstone for this enforcement action: it is DMV's claimed reason to open a file, assert power over this transaction, and move toward discipline. Proceeding while simultaneously erasing that complaint from the record and re-labeling a commercial Wrap District / Arash ROS as a "consumer sale" to Lacoste deprives Plaintiff of any meaningful opportunity to test timeliness, standing, or scope and turns the process into enforcement based on undisclosed information, rather than transparent administrative adjudication. From Plaintiff's perspective, there is no way to test

  **(a)** whether the complaint was timely.

  **(b)** whether it was made by a proper party (including an actual buyer or legally eligible claimant);

  **(c)** whether it described conduct DMV has authority over; or

  **(d)** whether DMV exceeded the scope of what was complained of. DMV's use of a Wrap District / Arash ROS to support a Lacoste "consumer victim" narrative

magnifies that due-process problem. By failing to produce the complaint while invoking it as the basis for discipline, and by mischaracterizing its own ROS in the Accusation, DMV used a missing jurisdictional fact and a distorted transaction record as the foundation for revocation and subsequent record exports. That omission and distortion are central to Plaintiff's due-process theory and to the later misuse of DMV records by private actors and out-of-state authorities.

**D.**

**Downstream Harm: Bond/Collection Reliance and CALG Civil Suit**

24.
DMV's October 8, 2019, letter and enforcement posture were foreseeably used by third parties as "proof of wrongdoing" to trigger bond and collection consequences. DMV's steering letter and later discipline were relied upon to frame Plaintiff as a wrongdoer and to justify monetary claims premised on DMV's record narrative. On or about January 14, 2020, Consumer Action Law Group ("CALG") filed a civil lawsuit in Los Angeles Superior Court, Case No. 20STCV02040, on behalf of Lacoste against 3RAW INC and others, seeking recovery on the dealer bond and related damages. The CALG complaint cited DMV's enforcement posture and letter as the basis for asserting that the dealer bond should be paid out to Lacoste. In that suit, CALG advanced a narrative of harm allegedly caused by the dealership, including claims that Lacoste lost money in amounts that do not match DMV's own narrative, while simultaneously using DMV's letter and enforcement position as a "ticket" to access the bond. DMV later adopted that bond-driven narrative and canceled 3RAW INC's license, effectively ratifying a civil-litigation story without ever reconciling it with DMV's own ROS data or vehicle-history data. Plaintiff pleads the CALG timeline not as a standalone claim here, but as due-process context: DMV never required Lacoste or CALG to reconcile their later civil-litigation narrative (and its internal contradictions) with DMV's own records, the three-transaction chain, or the vehicle-history data. Instead, DMV treated Lacoste as the unquestioned "consumer victim," exported that narrative into its Accusation and decision, and allowed that narrative to drive state-record consequences and bond/collection exposure.

**E.**

**Bonded-Title Posture, LAPD Clearance, Dealer Wind-Down, and February 2020 Vegas / Zvily Sequence**

25.
In or about early 2020, Plaintiff pursued bonded-title correction for the BMW i8 and obtained a motor-vehicle defective-title bond in connection with the VIN. On or about February 21, 2020, Plaintiff voluntarily presented the BMW i8 to LAPD Topanga Division. The vehicle was verified, confirmed recovered, and released to Plaintiff with no impound, no hold, and no arrest. This law-enforcement release recognized Plaintiff's possessory interest in the BMW i8 at that time and is reflected in third-party vehicle-history data as a theft/recovery event. After recovering the vehicle from

LAPD Topanga, Plaintiff drove the BMW i8 from Los Angeles to Las Vegas, Nevada, with the intention of returning the vehicle to Manheim (the auction) and resolving the dispute at the auction level, consistent with a dealer wind-down and bonded-title posture. Plaintiff alleges that during the broader period when ownership and title status were disputed, and while he was attempting to resolve the dispute through lawful channels, non-party Zvily had physical possession of the BMW i8 for extended stretches of time under the November 9, 2019, conditional agreement. Plaintiff is informed and believes, and thereon alleges, that during this dispute period, Zvily submitted one or more insurance claims to Interinsurance Exchange of the Automobile Club (AAA) (or its related underwriting entities) alleging that the BMW i8 had been stolen or damaged, while presenting himself as the person entitled to make such claims and to receive benefits, even though Plaintiff remained the true owner in a bonded-title posture and had not authorized those claims.

26.

While Plaintiff was in Nevada, DMV's records—as reflected in third-party vehicle-history data—show that on or about February 26, 2020, the Sherman Oaks DMV field office processed a title transaction for the BMW i8: "Title issued or updated — New owner reported." Plaintiff alleges that this title event reflects a transfer of record ownership to Zvily ("Owner 4"), even though Plaintiff never executed a valid transfer document or power of attorney authorizing such a change and even though any dealer-sale route was blocked by the prior suspension/abandonment of the dealer license and required going-out-of-business procedures. Plaintiff alleges that DMV processed the February 26, 2020 "new owner reported" entry without producing any lawful authorization instrument bearing Plaintiff's informed consent, without giving Plaintiff pre-deprivation notice or prompt post-deprivation notice and an opportunity to contest the change, and without reconciling this new-owner posture with the existing stolen-vehicle, bonded-title, dealer wind-down, and AAA-claim conditions.

F.

## CARFAX / Third-Party Vehicle-History Events Corroborating DMV-Fed Record Activity

27.

Plaintiff obtained and reviewed a CARFAX Vehicle History Report for the BMW i8. The report states that it is "based only on information supplied to CARFAX" as of a specified date and may not reflect all events. Plaintiff pleads the CARFAX report as a third-party summary of DMV-fed data and other sources, subject to full production of the underlying DMV record. (Ex. A (CARFAX Vehicle History Report).) The CARFAX report lists multiple events attributed to "California Motor Vehicle Dept." and multiple "stolen report / recovered" entries. Plaintiff pleads these events as corroboration that DMV-fed record activity occurred on specific dates and at specific field offices—particularly Woodland Hills and Sherman Oaks—during the disputed period. Plaintiff also obtained an AutoCheck report reflecting similar clusters of DMV

FIRST AMENDED COMPLAINT

10

and theft/recovery events, which he likewise pleads as corroborative of DMV-fed record changes. CARFAX's July 2019 chronology reflects auction/listing/sale and California emissions/service activity consistent with Plaintiff's three-transaction narrative, including:

a. "Auto Auction — Listed as a dealer vehicle — Vehicle sold" on or about July 1, 2019.

b. "California Inspection Station — Passed emissions inspection" on or about July 10, 2019; and

c. "BMW of Sherman Oaks — Vehicle serviced" and "Vehicle sold" mid-July 2019.

28.
CARFAX then reflects an August 7, 2019, DMV title event at Woodland Hills: "Title issued or updated — New owner reported — Loan or lien reported." Plaintiff alleges this Woodland Hills title event occurred while the BMW i8 was still in a dispute posture and shortly before his September 2019 stolen-vehicle report, and therefore must be supported, if at all, by underlying DMV instruments and notice logs that DMV has not yet produced. CARFAX reflects a September 2019 "stolen report" sequence consistent with Plaintiff's dispute posture and stolen-vehicle report, including a 09/06/2019 stolen-vehicle entry, a 09/14/2019 recovery, and a 09/18/2019 damage report. Plaintiff pleads these entries as corroboration that law enforcement and DMV were on notice of a theft/dispute posture as early as September 2019. CARFAX reflects a Sherman Oaks DMV odometer entry on November 9, 2019 ("Odometer reading reported"), which Plaintiff alleges aligns with the November 9, 2019, conditional agreement with Zvily and shows that DMV received data reflecting ongoing transaction activity in a dispute posture rather than a clean, final consumer sale. CARFAX reflects an accident entry in January 2020 (sideswipe collision, minor-to-moderate damage), which Plaintiff alleges lines up with the period when Zvily was in physical possession of the BMW i8 and submitting insurance claims to AAA alleging damage to the vehicle. CARFAX reflects a concentrated cluster of theft/recovery entries and critical DMV title events at Sherman Oaks in late February and March 2020, including: multiple stolen-vehicle reports and recoveries around February 3–4 and February 21, 2020; the February 26, 2020 "Title issued or updated — New owner reported" event; and a March 17, 2020 "Title issued or updated — Loan or lien reported" event. Plaintiff alleges these entries identify the precise window in which DMV processed and/or maintained adverse ownership/title changes without Plaintiff's informed consent and without meaningful pre-deprivation notice or opportunity to contest.

29.
CARFAX's glossary notes that "New Owner Reported" is associated with title transfer at a DMV, while also cautioning that not all title transactions necessarily represent true changes in beneficial ownership. Plaintiff does not allege that CARFAX

FIRST AMENDED COMPLAINT

11

itself proves ownership; rather, he pleads the "new owner reported" entries as red-flag indicators that require DMV to preserve and produce the underlying title applications, supporting documents, and notice logs for judicial review, and to explain how such title changes could have been lawfully processed in a bonded-title and active-dispute posture.

**G.**

### DMV Registration Cards Confirm Conflicting "Registered Owner" Swings

30.

Attached as is an August 7, 2019, California DMV registration card for the BMW i8 listing Plaintiff LORD MAISON PHIBONACCII as the registered owner and Fast Auto Loans, Inc. as lienholder, with an issue date of August 7, 2019.



This card matches the 08/07/2019 Woodland Hills "Title issued or updated – New owner reported – Loan or lien reported" entry appearing in third-party vehicle-history data and confirms that, as of that date, DMV itself treated Plaintiff—not Mickey Lacoste or Nisim Zvily—as the registered owner of record. The August 7, 2019, registration card also shows the BMW i8 registered to Plaintiff's Woodland Hills address, consistent with his status as dealer/possessor and inconsistent with any theory that Lacoste had already become a bona fide "consumer owner" by that time. In other words, on DMV's own paper, the vehicle had been unwound back into 3RAW INC / Plaintiff inventory and was still under Plaintiff's control when DMV's Woodland Hills title event posted. Attached is a later California DMV validated registration card for the same BMW i8 listing NISIM ZVILY as the registered owner at a Sherman Oaks address. The card reflects a later issue/fee-received date in 2020 and a registration period extending into 2021. Plaintiff pleads this later card as evidence that DMV subsequently moved the registration into Zvily's name, even though:

    **a.**    Plaintiff's dealer license had already been suspended in or about September 2019 on the theory that he had "abandoned" the dealership.

    **b.**    Under DMV's own "dealer going out of business" and wind-down rules, 3RAW INC could not lawfully process new retail sales or create a new

consumer owner of the BMW i8 during that suspension/wind-down posture; and

    **c.**    At the time of the February 26–29, 2020 ownership-change window reflected in vehicle-history data, Plaintiff was physically in Las Vegas, Nevada, after LAPD Topanga had just released the recovered BMW i8 back to him on or about February 21, 2020.

**31.**

Plaintiff alleges that while title and registration dispute issues were still being handled and addressed, DMV could not legitimately process a clean "new owner" transfer out of 3RAW INC / Plaintiff's name because doing so would have required compliance with DMV's own dealer-closure procedures and valid, contemporaneous authorization instruments from Plaintiff. Yet the combination of: (i) third-party "New owner reported" entries in late February 2020; and (ii) the later DMV registration card listing Zvily as registered owner, shows that DMV accepted and memorialized an ownership transfer in favor of Zvily during a period when:

    **a.**    Plaintiff's dealer license was suspended;

    **b.**    the BMW i8 was supposed to be treated as part of a dealer wind-down / bonded-title dispute, not as dealer inventory available for a fresh retail sale and;

    **c.**    Plaintiff himself was in custody in Clark County following a Las Vegas arrest, triggered by Zvily's report, and therefore could not have personally executed DMV paperwork to authorize an ordinary, consensual transfer of ownership in favor of Zvily.

**H.**
           **Las Vegas Arrest, Bond Acceptance, LVMPD Statement, and Causal Chain**

**32.**

On or about February 29, 2020, as a direct result of the late-February 2020 "stolen vehicle" reports and the title status that showed non-party Nisim Zvily as the "new owner," Plaintiff was arrested in Clark County, Nevada and booked on charges relating to possession/receiving/transfer of a "stolen" vehicle. The vehicle at issue was the same 2016 BMW i8, VIN WBY2Z2C52GV675765, that Plaintiff had previously presented to LAPD Topanga Division for verification and that had been released back to him days earlier. The Las Vegas Justice Court issued a Bond Acceptance Notice in Case No. PC20F04540X, dated February 29, 2020, listing Plaintiff by name, describing the charge as "poss/rev/transf stolen veh, $3500+ [NRS 205.***]," and setting bail at $10,000.00 through Free Bail Bonds LLC, with a mandatory appearance on March 30, 2020 at 8:00 a.m. in Department 10. [Las Vegas Justice Court Bond Acceptance Notice].) Plaintiff alleges that this Nevada arrest and $10,000 bond obligation were not the product of a neutral reassessment of ownership, but rather flowed directly from DMV's defective February 26, 2020 "new owner reported" title

event and the subsequent use of that record to cast Plaintiff as a trespasser to his own former inventory. Once DMV records treated Zvily as the lawful "owner," police and courts in another state treated Plaintiff's continued possession and efforts to return the BMW i8 to the auction as criminal, resulting in a concrete deprivation of liberty, financial costs, and reputational harm.

 

While title to the BMW i8 was in active dispute and Plaintiff was pursuing bonded-title correction, non-party Nisim Zvily took possession of the vehicle and, upon information and belief, initiated or assisted in initiating multiple insurance and police reports treating the BMW i8 as his "stolen" property even as DMV records and dealer-wind-down rules remained unsettled. Plaintiff alleges that Zvily also submitted fraudulent insurance claims to AAA asserting damage to the BMW i8 while title remained contested and while Plaintiff and 3RAW INC were still being treated as responsible parties in DMV files and dealer-bond posture. On or about March 2, 2020, in connection with events at or near 125 E. Tropicana Avenue in Las Vegas, Nevada, Zvily provided a written "Voluntary Statement" to Las Vegas Metropolitan Police Department ("LVMPD") in which he identified Plaintiff by name as the "suspect," stated that he had come to Las Vegas to retrieve "my stolen vehicle" from the police, and described Plaintiff's arrest and his own retrieval of the BMW i8 from law-enforcement custody. ([Zvily LVMPD Voluntary Statement].) Plaintiff alleges that Zvily's LVMPD statement confirms the sequence pleaded above: after DMV processed a February 26, 2020 "new owner reported" title event at the Sherman Oaks field office without Plaintiff's informed consent or meaningful notice, Zvily traveled to Nevada, reported the BMW i8 as "stolen" in his own name, had law enforcement

FIRST AMENDED COMPLAINT

seize the vehicle, and then recovered it from the impound while Plaintiff was arrested. This demonstrates how DMV's defective ownership-change processing, in a dealer-wind-down and bonded-title posture, directly enabled third-party misuse of "stolen vehicle" narratives and caused Plaintiff concrete liberty and property harms. The stolen-report cluster reflected in CARFAX for February 21–March 2, 2020, together with Zvily's LVMPD Voluntary Statement, shows that once DMV records portrayed Zvily as the "new owner," subsequent police and insurance systems treated Plaintiff as a trespasser to his own former inventory and treated Zvily as the aggrieved party. Plaintiff alleges this is precisely the kind of cascading harm that follows when a state agency changes vehicle ownership records without lawful authorization and without constitutionally adequate notice and opportunity to be heard. The February 29, 2020 arrest and associated bail requirements are part of the same causal chain: a DMV-processed ownership change in a dealer-wind-down / bonded-title dispute posture, followed by fraudulent stolen-vehicle reports in Zvily's name, culminating in Plaintiff being jailed and forced to post bond as though he were stealing his own inventory.

**I.**

**Zvily's AAA Theft Claim and AAA's May 20, 2020, Letter**

33.
On or about May 20, 2020, Plaintiff received a written response from Interinsurance Exchange of the Automobile Club (AAA), addressed to "Lord Phibonaccii" and referencing AAA Policy No. CAA106656037, Claim No. 014111788, with "Named Insured: Nisim Zvily" and "Date of Loss: February 6, 2020." ([AAA May 20, 2020, letter].) The letter was signed by Claudia J. Rodriguez, Vice President, Insurance Claims.

 

FIRST AMENDED COMPLAINT

AAA stated that it was responding to an inquiry the company had received from the California Department of Insurance regarding Plaintiff's complaint that the 2016 BMW i8 had been "embezzled" by Zvily and that monies were owed to Plaintiff toward a total-loss settlement. AAA reported that, according to its internal claim file, its insured, Nisim Zvily, had "filed a theft claim involving his 2016 BMW I8 with the date of loss being 2/21/20," and that "the vehicle was ultimately recovered and returned to Mr. Zvily." The letter thus confirms that Zvily used the same BMW i8 to open a theft claim with AAA while title and ownership were still in active dispute. AAA further wrote that "it appears you took the vehicle from Mr. Zvily, with a key you had in your possession, due to a civil dispute regarding ownership," and that "according to documentation, you sold the vehicle to Mr. Zvily back in November 2019 and waived ownership rights." Based on those premises, AAA concluded that Plaintiff's complaint was a "contract dispute rather than a tort claim," and that "your claim for compensation does not appear warranted."

**34.**

Plaintiff alleges that AAA's description of "documentation" mirrors, and likely relies upon, the same defective DMV-fed narrative and late-February 2020 "new owner reported" title event challenged in this action: namely, a portrayal of Zvily as the lawful owner as of November 2019 and of Plaintiff as someone who had "waived ownership rights," even though the November 9, 2019 agreement expressly reflected a large remaining balance (approximately $62,000) and conditional terms, and even though DMV had processed the February 26, 2020 new-owner title event in a bonded-title / dispute posture without Plaintiff's consent or meaningful notice. Plaintiff further alleges that the AAA letter itself contains internal inconsistencies—stating a "Date of Loss: February 6, 2020" in the header while describing "the date of loss being 2/21/20" in the body—and that these mismatched dates echo the broader pattern of misdating and narrative shifting in other third-party records



(including bond/collection documents).These inconsistencies reinforce Plaintiff's allegation that later actors simply adopted and repackaged a DMV-driven ownership story without independently reconciling it with the actual transactional record or with

FIRST AMENDED COMPLAINT

16

Plaintiff's bonded-title and LAPD Topanga clearance. Plaintiff pleads the AAA correspondence not as a separate insurance-bad-faith claim in this action, but as further evidence of (a) how DMV's defective ownership and enforcement narrative was exported to and relied upon by other institutions; (b) how Zvily continued to profit from that narrative by opening a theft claim on the disputed vehicle; and (c) how Plaintiff was further harmed when his own "embezzlement" complaint to regulators and AAA was rejected on the ground that he had supposedly sold and waived all rights in November 2019—precisely the characterization he challenges in this lawsuit.

J.

**Fast Auto Loans Payoff, Lien-Release Request, and Bonded-Title Gap**

35.

Attached as is a November 11, 2019 payment receipt from Fast Auto Loans, Inc. dba Fast Auto and Payd, showing a payment of $11,196.89 applied to Account No. TL-CA1697-190716-2089-01 in Plaintiff's name, LORD MAISON PHIBONACCII, for the BMW i8. The receipt reflects a starting principal balance of $10,919.73, finance charges of $277.16, and an ending balance of $0.00, confirming that Plaintiff paid off the Fast Auto Loans lien in full as of November 11, 2019. (Fast Auto Loans payoff receipt].)




36.

FIRST AMENDED COMPLAINT

17

Attached as is a January 7, 2020 "Lien Release Request Acknowledgement Document" generated through DDI Technology / Premier eTitleLien. The document lists the VIN WBY2Z2C52GV675765, describes the vehicle as a 2016 BMW i8, and identifies the owner as "3RAW INC OR PHIBONACCII LORD MAISON, 6203 VARIEL AVE 320, WOODLAND HLS, CA 913670000," with Fast Auto Loans, Inc. as lienholder. It confirms that, on January 7, 2020, an electronic transaction was transmitted by the lienholder to the State requesting that the lien on the vehicle be released. ([DDI/Premier eTitleLien lien-release acknowledgment].) Plaintiff alleges that even after Fast Auto Loans was paid in full on November 11, 2019, and transmitted the January 7, 2020, electronic lien-release request, DMV did not promptly remove the lien or deliver a clear certificate of title in Plaintiff's name. Instead, the VIN remained in a limbo status with Fast Auto Loans still showing in DMV records, even as Plaintiff was trying to resolve the underlying dealership-suspension and ownership issues. Plaintiff alleges that by early January 2020, Fast Auto Loans had been fully paid and had electronically requested a lien release, but DMV's systems had not processed that release in a way that delivered clear title to Plaintiff. The gap between (a) the payoff and lien-release request on Fast Auto Loans' side and (b) DMV's failure to deliver title or accurately reflect Plaintiff's interests forced Plaintiff into a bonded-title posture for the BMW i8, in the very window when the dealer license was suspended and Plaintiff could not use ordinary dealer-sale mechanisms.

### K.
### Western Surety Defective Title Bond Confirms DMV-Recognized Dispute and Joint Protection

37.

On or about January 8, 2020, in order to move the BMW i8's title forward while the lien-release and ownership issues were still unresolved, Plaintiff obtained a Motor Vehicle Defective Title Bond from Western Surety Company in the penal sum of $35,000.00, Bond No. 64925702, effective January 8, 2020, naming Plaintiff LORD MAISON PHIBONACCII as Principal and the California Department of Motor Vehicles as obligee. ([Western Surety Motor Vehicle Defective Title Bond, effective 1/8/20].) The Western Surety bond recites that Plaintiff, as Principal, had applied to DMV "for the registration of and the issuance of a California certificate of registration of ownership" for the 2016 BMW i8, VIN WBY2Z2C52GV675765, but had not presented the evidence of title "regularly required" by DMV; DMV therefore required Plaintiff to deposit a defective-title bond as a condition of issuing a California certificate of title. The bond obligates Western Surety and Plaintiff up to $35,000 to protect DMV and any "interested person" with a valid adverse claim—including parties such as non-party Nisim Zvily—against undisclosed liens, encumbrances, or ownership disputes.

FIRST AMENDED COMPLAINT



FIRST AMENDED COMPLAINT

19

Plaintiff alleges that he obtained the defective-title bond to protect both his interests and the interests of anyone with a legitimate claim, including Zvily, while the title, lien, suspended-dealer, and insurance-fraud issues were sorted out. Because DMV had suspended 3RAW INC's dealer license on an "abandonment" theory, Plaintiff could not lawfully process a fresh retail sale or clean transfer of the BMW i8 through the usual dealer-sale channels. The defective-title bond therefore functioned as a structured safety net: it allowed DMV to move the title forward under its own rules without prejudging ownership and while giving any true claimant a bonded remedy.

**38.**

Plaintiff alleges that DMV's requirement and acceptance of this Western Surety defective-title bond confirms that, as of January 8, 2020, DMV itself formally recognized the BMW i8 as being in a defective-title / disputed-ownership posture rather than a clean, completed retail sale. DMV knew that

**(a)** the Fast Auto Loans finance lien had just been paid off and an electronic lien-release request had been transmitted.

**(b)** Plaintiff was seeking to regularize title in his own name in a suspended-dealer and wind-down posture; and

**(c)** there remained a risk of conflicting ownership claims that the bond was expressly designed to cover.

**39.**

In this bonded-title posture—where the dealer license was already suspended and a defective-title bond was on file to protect all interested parties—Plaintiff alleges that DMV could not lawfully process a later "new owner reported" transfer out of Plaintiff / 3RAW INC's chain of title without

**(1)** valid, contemporaneous authorization from Plaintiff, and

**(2)** constitutionally adequate notice and opportunity to contest any adverse entry. Nevertheless, less than two months later, on or about February 26, 2020, DMV's Sherman Oaks field office processed a "Title issued or updated – New owner reported" event that Plaintiff alleges transferred record ownership to non-party Nisim Zvily while Plaintiff was in Las Vegas and while the defective-title bond was in force. DMV's willingness to process that adverse ownership change in the middle of a suspended-dealer, bonded-title dispute—rather than hold the record in a neutral bonded posture and let any claimant proceed against the bond—is a core part of the due-process violation challenged in this action.

**L.**

**Ongoing Injury**

**40.**

As a direct and proximate result of DMV's record-driven enforcement and record-keeping actions—including the missing complaint, mischaracterized ROS, dealer-license revocation, adverse title/registration entries, acceptance of fraudulent ownership change in a bonded-title/dealer-wind-down posture, and export of those

FIRST AMENDED COMPLAINT

20

records into criminal, civil, insurance, and collection contexts—Plaintiff has suffered loss of dealer operations, impaired ability to transact in vehicle and credit markets, reputational injury, emotional distress, and ongoing exposure to adverse inferences and collateral reliance so long as DMV's defective discipline and VIN record actions remain uncorrected.

VI.

### CHRONOLOGICAL TIMELINE AND MISALIGNMENT OF OFFICIAL NARRATIVES

A.

### Transaction 1 – Wrap District / Arash ROS vs. DMV "Consumer" Narrative

41.

July 6, 2019 – Wrap District commercial attempt. The BMW i8 enters a commercial transaction attempt with THE WRAP DISTRICT INC, documented by a DMV Report of Sale ("ROS") that identifies Wrap District as the buyer and lists Arash Bagherabadi by California driver-license number as the driver/representative. The ROS does not list Mickey Lacoste as the buyer of record; his name only appears peripherally.

42.

July 6, 2019 – Wind-back. The Wrap District commercial attempt is not approved and does not fund. The transaction is unwound ("wind-back") the same day, and the BMW i8 returns to 3RAW INC / Plaintiff inventory. Any ROS/QuickTags activity tied to this commercial attempt should have been voided or withdrawn at that point.

43.

DMV misalignment #1 – ROS vs. Accusation. Despite its own ROS showing Wrap District/Arash as the buyer, DMV's later Accusation repackages this July 6 ROS as part of a "consumer sale to Lacoste" and frames Lacoste as the "defrauded buyer," without ever reconciling the ROS buyer line with that narrative. This is the first core misalignment between DMV's own exhibit and its enforcement story.

B.

### Transaction 2 – Lacoste Conditional Delivery, Denied Credit, CALG Suit

44.

July 9–11, 2019 – Lacoste credit application & conditional delivery. After the Wrap District wind-back, Lacoste applies for financing on the BMW i8. Plaintiff enters into a conditional-delivery arrangement allowing Lacoste temporary possession while his credit is reviewed. The conditional delivery is expressly contingent on credit approval; no title or funded retail-installment contract exists at this point. Mid-July 2019 – Credit denial. Lacoste's credit application is denied. Under the conditional-delivery terms and ordinary dealer practice, he is required to return the BMW i8. Lacoste instead refuses and keeps the vehicle without an approved loan or valid title transfer.

45.

FIRST AMENDED COMPLAINT

21

September 6–18, 2019 – Theft / recovery / damage cluster. Vehicle-history data later reflect:

 (i) 09/06/2019 – "Stolen report – California – vehicle reported stolen";

 (ii) 09/14/2019 – "Vehicle recovered after theft"; and

 (iii) 09/18/2019 – "Damage reported." These entries align with Plaintiff's stolen-vehicle report after Lacoste refused to return the BMW i8 and show law enforcement and DMV were on notice of an embezzlement / dispute posture by September 2019.

**46.**

September 2019 – Dealer "abandonment" suspension. Around the same time, DMV suspends 3RAW INC's dealer license on an "abandonment" theory, effectively placing the dealership into a wind-down posture. Under DMV's own "going out of business" rules, 3RAW INC should not be able to process fresh retail sales out of inventory while suspended. October 8, 2019 – Bartolone bond letter. DMV Sergeant John Bartolone sends Lacoste a letter stating DMV has identified violations in connection with a "sale" and gives Lacoste Hudson bond information, effectively steering him into a bond claim as the "buyer/victim," even though DMV's cited ROS shows Wrap District / Arash as buyer and Lacoste was only a denied conditional customer.

**47.**

January 14, 2020 – CALG lawsuit filed. Consumer Action Law Group ("CALG") files a civil action on Lacoste's behalf to go after the dealer bond, adopting DMV's "consumer victim" theory and portraying DMV's enforcement posture as proof of wrongdoing by 3RAW INC. CALG alleges a money-loss story (including a supposed $15,000 "loan") that does not line up with DMV's Accusation chronology or the commercial/conditional structure of the three transactions.

**48.**

DMV misalignment #2 – CALG story vs. DMV record. DMV never forces CALG/Lacoste to reconcile:

 (i) the Wrap District / Arash ROS;

 (ii) Lacoste's denied credit and refusal to return the car; and

 (iii) He internally inconsistent "I was defrauded but then loaned him $15,000 more" story. Instead, DMV revokes Plaintiff's license using essentially the same narrative CALG used to pursue bond money, without exposing the contradictions in a transparent record.

**C.**

  **Transaction 3 – Zvily Conditional Agreement, DMV "New Owner" Entry, Las Vegas, AAA**

**49.**

November 9, 2019 – Conditional agreement with Nisim Zvily. Plaintiff and Zvily sign a conditional agreement on the BMW i8 showing a large unpaid balance (about $62,000) and conditions precedent to any final transfer of ownership. This document confirms that as of that date Zvily is not a fully paid bona fide owner; his status is conditional and payment dependent.

50.

November 11, 2019 – Fast Auto Loans payoff. Fast Auto Loans issues a receipt showing Plaintiff paid $11,196.89 to bring the account to a $0.00 balance on the BMW i8 loan.

51.

January 7, 2020 – Lien-release request transmitted. Fast Auto Loans, via DDI / Premier eTitleLien, transmits an electronic lien-release request to DMV listing "3RAW INC OR PHIBONACCI LORD MAISON" as owner, confirming the finance company has been paid and that, from Fast Auto's perspective, the lien is satisfied.

52.

January 8, 2020 – Defective title bond issued to protect all interests. Western Surety Company issues a $35,000 Motor Vehicle Defective Title Bond in Plaintiff's favor for the BMW i8 after DMV requires a defective-title bond as a condition of issuing a California certificate of title. The bond is expressly designed to protect DMV and any "interested person" (including parties like Zvily) against undisclosed adverse claims while the title dispute is resolved in a suspended-dealer, bonded-title posture that Plaintiff could not bypass by simply "selling" the car through ordinary dealer channels.

53.

February 21, 2020 – LAPD Topanga clearance. Plaintiff voluntarily brings the BMW i8 to LAPD Topanga; officers verify and release the vehicle back to Plaintiff with no impound or arrest. Vehicle-history data show a matching stolen/recovered entry for this date. Plaintiff then drives toward Las Vegas intending to return the car to Manheim.

54.

February 21–26, 2020 – Plaintiff in Nevada; DMV processes "new owner reported" event. After LAPD clearance, Plaintiff drives the BMW i8 toward Las Vegas to return it to Manheim. While Plaintiff is out of state and while the Western Surety defective-title bond remains in force, DMV's Sherman Oaks office processes a February 26, 2020, title event recorded in vehicle-history data as "Title issued or updated – New owner reported." Plaintiff alleges this corresponds to a fraudulent or unauthorized transfer into Zvily's name processed without his consent and in direct tension with the payoff, lien-release request, defective-title bond, and suspended-dealer / wind-down posture.

55.

FIRST AMENDED COMPLAINT

February 28–29, 2020 – Zvily reports "stolen" in Nevada; Plaintiff arrested. Using the just-created DMV status that now shows him as "owner," Zvily reports the BMW i8 stolen in Las Vegas. LVMPD recovers the vehicle, has it towed to an impound, and arrests Plaintiff for possession/receipt/transfer of a stolen vehicle. The Las Vegas Justice Court issues a Bond Acceptance Notice (Case No. PC20F04540X) on February 29, 2020, setting $10,000 bail and listing the BMW-related stolen-vehicle charge.

**56.**
March 2, 2020 – LVMPD Voluntary Statement. Zvily signs an LVMPD Voluntary Statement describing Plaintiff as the suspect, calling the BMW i8 "my stolen vehicle," and recounting that he recovered the vehicle from police after Plaintiff's arrest. The timing lines up with the February 26 "new owner" DMV event and confirms that Zvily leveraged the DMV title entry to position himself as victim/owner in Nevada.

**57.**
May 20, 2020 – AAA letter. AAA sends Plaintiff a letter referencing Policy No. CAA106656037, Claim No. 014111788, with "Named Insured: Nisim Zvily" and a February 2020 date of loss. AAA explains that Zvily filed a theft claim on "his 2016 BMW I8," asserts that Plaintiff "sold the vehicle to Mr. Zvily back in November 2019 and waived ownership rights," and re-characterizes Plaintiff's embezzlement complaint as a mere contract dispute—relying on the same defective DMV/ownership narrative and conditional-agreement mischaracterization challenged here.

**58.**
DMV misalignment #3 – Bonded-title / LAPD clearance vs. "new owner" entry. The bonded-title posture, LAPD Topanga release to Plaintiff, Fast Auto payoff and lien-release request, and dealer suspension/wind-down are all in effect at the exact time the Sherman Oaks DMV office records a "new owner reported" transaction for the BMW i8. DMV processes that title change

  **(i)**     without Plaintiff's informed consent,

  **(ii)**    without pre-deprivation notice or a meaningful post-deprivation hearing, and

  **(iii)**   despite obvious warning flags (stolen-vehicle history, bonded title, pending civil dispute, dealer suspension). By processing a clean "new owner" transfer in that posture, DMV effectively bypassed the very Western Surety defective title bond it had just required to protect all interested parties and did so without any notice or hearing for the one person (Plaintiff) who remained bound on the bond and on the prior finance obligations. That title change is then relied on by LVMPD, the Las Vegas court, and AAA to treat Zvily as owner and Plaintiff as a criminal / contract-breaching outsider.

  **D.**
         **DMV PRA "Purged File" Letter and Complaint-Date Misalignment**

FIRST AMENDED COMPLAINT

**59.**

October 8, 2025 – PRA response and "purged" case file. In response to Plaintiff's Public Records Act request for DMV Investigations Case No. 19M3L26883, the DMV Legal Affairs Division sends an October 8, 2025, letter stating that the investigative case file has been purged under DMV criteria and is no longer available, but adding that:



    **(i)**    DMV "received a complaint in June 2020 regarding alleged fraudulent transfer of a 2016 BMW i8 purchased from 3RAW Inc"; and

    **(ii)**    the matter "was closed in March 2021 following revocation of 3RAW Inc.'s vehicle dealer license and special plates."

**60.**

DMV misalignment #4 – Long-running 2019 enforcement vs. "complaint received June 2020."DMV's own Accusation and timelines show that:

    **(i)**    the Wrap District / Arash ROS is from July 6, 2019;

    **(ii)**    the Lacoste conditional delivery / theft report / CALG lawsuit all pre-date 2020; and

    **(iii)** DMV suspended the dealer license in 2019 and issued enforcement letters in October 2019. Yet DMV's PRA reply now claims that "the department received a complaint in June 2020" regarding a fraudulent transfer of this same BMW i8. That means DMV asserts the "complaint" that supposedly underlies Investigations Case 19M3L26883 did not arrive until months after the key 2019 events and even after CALG had already filed its January 2020 civil complaint—and DMV still cannot produce the actual complaint or the investigative file because it says the file was purged. This direct complaint-date misalignment reinforces Plaintiff's allegation that

FIRST AMENDED COMPLAINT

DMV is basing discipline and record actions on an unidentified, post-hoc "complaint," while simultaneously using earlier events and bond-suit narratives as though they had been properly complained of and adjudicated in real time. That mismatch is at the heart of Plaintiff's procedural due-process claim.

**E.**

**Timeline Summary and Misalignment of DMV / CALG / AAA Narratives**

61.

For clarity, Plaintiff summarizes the key events regarding the BMW i8, VIN WBY2Z2C52GV675765, as follows (dates approximate where indicated):

**2019**

**(i)** July 6, 2019 — Wrap District ROS and wind-back.

DMV's own Accusation cites a ROS showing THE WRAP DISTRICT INC and its representative Arash (with California driver-license number) as buyer. The transaction was not approved, did not fund, and was unwound the same day, returning the BMW i8 to 3RAW INC / Plaintiff inventory.

**(ii)** July 10–11, 2019 — Lacoste conditional delivery; credit denied.

Lacoste applies for financing and receives conditional delivery while the application is processed. Credit is denied; under the conditional-delivery terms he must return the vehicle, but refuses.

**(iii)** August 7, 2019 — Woodland Hills DMV title/registration.

DMV records show a title event at Woodland Hills—"Title issued or updated – New owner reported – Loan or lien reported"—and an August 7, 2019 registration card lists Plaintiff as registered owner at the Woodland Hills address with Fast Auto Loans as lienholder. This aligns with Plaintiff's status as dealer/possessor and not with any completed Lacoste "consumer sale."

**(iv)** September 6–18, 2019 — Stolen / recovered / damage cluster.

Vehicle-history reports show a September 6 stolen report, September 14 recovery, and September 18 damage report, matching Plaintiff's stolen/embezzlement report after Lacoste refused to return the car.

**(v)** November 9, 2019 — Conditional agreement with Nisim Zvily.

Plaintiff and Zvily execute a written agreement reflecting an outstanding balance of roughly $62,000 and conditional terms. This is not a paid-in-full sale; ownership remains disputed and conditional.

**(vi)** November 11, 2019 — Fast Auto Loans payoff.

Fast Auto Loans issues a receipt showing Plaintiff paid $11,196.89 to bring the account to a $0.00 balance on the BMW i8 loan.

**2020**

**(vii)** January 7, 2020 — Lien-release request transmitted.

DDI / Premier eTitleLien sends DMV a lien-release request on Fast Auto's behalf, listing 3RAW INC or Plaintiff as owner and confirming the lien has been satisfied.

FIRST AMENDED COMPLAINT

**(viii)** January 8, 2020 — Defective-title bond issued and mailed. Western Surety Company issues a $35,000 Motor Vehicle Defective Title Bond in Plaintiff's favor for the BMW i8 after DMV requires a defective-title bond as a condition of issuing a California certificate of title. Simplebond Insurance Services sends Plaintiff a cover letter with the signed and sealed bond, instructing him to sign as Principal and file it with DMV. The bond is intended to protect DMV and any interested persons (including Zvily) while the disputed title is resolved in a suspended-dealer, bonded-title posture.

**(ix)** February 21, 2020 — LAPD Topanga clearance. Plaintiff voluntarily presents the BMW i8 to LAPD Topanga; officers verify and release it to him with no impound or arrest. Vehicle-history data show a matching stolen/recovered entry that day.

**(x)** February 21–26, 2020 — Plaintiff drives to Las Vegas; DMV processes "new owner reported" event. After LAPD clearance, Plaintiff drives the BMW i8 toward Las Vegas intending to return it to Manheim. While Plaintiff is out of state and the defective-title bond remains in effect, DMV's Sherman Oaks office processes a February 26, 2020 title event—"Title issued or updated – New owner reported"—which Plaintiff alleges reflects an unauthorized transfer into Zvily's name.

**(xi)** February 28–29, 2020 — Zvily reports "stolen" in Nevada; Plaintiff arrested. Based on DMV records that now show him as "owner," Zvily reports the BMW i8 stolen. LVMPD seizes the car, has it towed, and arrests Plaintiff for possessing/transferring a stolen vehicle. The Las Vegas Justice Court sets $10,000 bail.

**(xii)** March 2–17, 2020 — Further stolen/recovered entries; lien updated. Vehicle-history data record more stolen/recovered activity and a March 17, 2020 Sherman Oaks entry—"Title issued or updated – Loan or lien reported"—showing DMV continued to modify title/lien records during the dispute.

**(xiii)** May 20, 2020 — AAA denial letter. AAA sends Plaintiff a letter referencing Policy No. CAA106656037 and Claim No. 014111788, with "Named Insured: Nisim Zvily." AAA states Zvily filed a theft claim on his "2016 BMW I8," asserts that Plaintiff "sold the vehicle … in November 2019 and waived ownership rights," and re-casts Plaintiff's complaint as a mere contract dispute.

**62.**
Plaintiff alleges that these events reveal material misalignments among different narratives:

- DMV Accusation vs. its own ROS / records. The Accusation treats Lacoste as the "consumer buyer/victim" even though the cited ROS names Wrap District and Arash as the buyer, and later Woodland Hills

FIRST AMENDED COMPLAINT

27

title/registration shows Plaintiff as registered owner with a dealer-finance lien—not Lacoste.

- CALG civil suit vs. transaction history.

CALG's complaint uses DMV's investigation letter as a ticket to the bond and portrays Lacoste as having suffered specific monetary losses, while simultaneously describing a $15,000 "loan" to Plaintiff that is commercially inconsistent with a genuine consumer-victim posture and not supported by the ROS or payment trail.

- AAA letter vs. November 9 agreement and DMV record.

AAA adopts Zvily's narrative that Plaintiff "sold the vehicle … in November 2019 and waived ownership rights," even though the November 9, 2019, agreement shows a large unpaid balance and conditional terms, and even though DMV required Plaintiff to obtain a defective-title bond in January 2020 and then processed a "new owner" title event in February 2020 without his consent.

- Vehicle-history stolen-report cluster vs. DMV's lack of process.

The CARFAX timeline shows repeated stolen/recovered events around the same dates as LAPD Topanga clearance and the February 26, 2020, Sherman Oaks "new owner reported" entry. Plaintiff alleges this demonstrates that DMV changed ownership records in the middle of an active theft/bonded-title dispute without affording him meaningful notice or a chance to contest the change.

63.

Plaintiff contends that these misalignments illustrate the core procedural-due-process defect in this case: DMV treated a disputed, multi-party commercial chain as a simple "consumer sale gone bad," revoked his license based on a missing complaint and a distorted ROS narrative, and then allowed its defective ownership/title records to be exported into criminal, civil, insurance, and collection contexts where they were treated as if they were accurate, causing cascading harm.

VII.

**CLAIMS FOR RELIEF FIRST CLAIM FOR RELIEF (42 U.S.C. § 1983 – Procedural Due Process – Property and Liberty Interests) (Against Humphreys, Berry, Maiorana, Chapman, and Bartolone in Their Individual Capacities)**

64.

Plaintiff realleges and incorporates by reference all preceding paragraphs of this First Amended Complaint as though fully set forth herein, including the allegations in Sections V.A–V.L and VI (dealer licensing and suspension; three-transaction sequence; missing complaint; bond/collection reliance; Fast Auto payoff and lien-release request; Western Surety defective-title bond; bonded-title posture; LAPD Topanga release; DMV-fed CARFAX events; conflicting DMV registration cards; Las Vegas arrest and bond; Zvily's LVMPD statement; AAA's May 20, 2020 letter; and the chronological misalignments). At all relevant times, each of the Individual Defendants—Humphreys, Berry, Maiorana, Chapman, and Bartolone—was acting

FIRST AMENDED COMPLAINT

28

under color of state law in their capacities as DMV attorneys, decisionmakers, investigators, or enforcement personnel. See West v. Atkins, 487 U.S. at 49–50. Plaintiff had constitutionally protected property interests, including but not limited to:

    a. his California dealer license and associated special plates No. 98813 through 3RAW INC;

    b. his business goodwill and dealer operations as a going concern;

    c. his ownership and possessory interest in the 2016 BMW i8, VIN WBY2Z2C52GV675765, including the bonded-title posture, as recognized by DMV's own August 7, 2019 registration card listing Plaintiff as registered owner; and

    d. the accuracy and integrity of state-maintained title and registration records that control whether Plaintiff is treated as the lawful owner or as a trespasser to his own inventory. See Bell v. Burson, 402 U.S. at 539–40.

**65.**
Plaintiff also had protected liberty interests, including but not limited to:

- his freedom from arrest, detention, and the requirement to post bail based on DMV-fed records miscasting him as a thief of his own vehicle;

- . freedom from reputation-destroying stigmatization grounded in officially maintained DMV records that portray him as a wrongdoer and fuel bond payouts, collection efforts, and insurance/credit decisions; and

- his ability to pursue his chosen occupation in the vehicle and credit markets without being burdened by DMV-created discipline and VIN-history data that are materially inaccurate and unsupported by lawful process. See Paul v. Davis, 424 U.S. at 708–10.

**66.**
The Individual Defendants deprived Plaintiff of these property and liberty interests without constitutionally adequate notice and opportunity to be heard in at least the following ways:

    **a.** Missing complaint / jurisdictional cornerstone.
By initiating, prosecuting, and deciding the enforcement action in In re 3RAW Inc., Case No. 20-02069, while invoking an unspecified "complaint" as the supposed basis for DMV jurisdiction but never identifying, producing, or disclosing that complaint to Plaintiff, thereby denying him any meaningful chance to challenge timeliness, standing, scope, or accuracy of the complaint. See Loudermill, 470 U.S. at 542–46.

    **b.** Mischaracterized ROS / false "consumer sale" framing.
By knowingly relying on a July 6, 2019, ROS that, on its face, identifies Wrap District and Arash as the buyers, and nonetheless recasting that ROS as a "consumer sale" to Mickey Lacoste, without reconciling this contradiction in the Accusation or at hearing, and without giving Plaintiff a fair chance to confront that mischaracterization.

FIRST AMENDED COMPLAINT

29

**c.** Default discipline and license revocation.
By pressing for and issuing a default Decision and Order revoking 3RAW INC's dealer license and plates No. 98813 (signed by Chapman), premised on the mischaracterized ROS and missing complaint, without ensuring Plaintiff received constitutionally adequate notice, a fair opportunity to be heard, and a decision grounded in an accurate record. See Mathews, 424 U.S. at 333–35.

**d.** Title/registration changes without due process in a bonded-title, suspended-dealer posture. By processing or allowing to be processed a February 26, 2020 "Title issued or updated – New owner reported" transaction and related subsequent registration in non-party Zvily's name, during a bonded-title / dealer wind-down dispute posture—after Fast Auto payoff, after a January 7 lien-release request, and after DMV required and accepted a Western Surety defective-title bond—without:

**(xiv)** contemporaneous, written notice to Plaintiff;

**(xv)** a meaningful, pre-deprivation opportunity to contest the ownership change; or

**(xvi)** any valid authorization instrument bearing Plaintiff's informed consent.

**(xvii)** Record export into downstream systems.
By creating, certifying, and maintaining DMV records and decisions they knew or reasonably should have known would be relied upon by criminal-justice, bond, insurance, and collection actors—including HUDSON, CALG, AAA, law enforcement, and courts—while those records were internally contradictory and the product of missing or distorted information, thereby causing Plaintiff to be arrested, jailed, and forced to post bond, and to face adverse bond/insurance consequences. See Zinermon, 494 U.S. at 135–39. Defendant Bartolone, in particular, personally sent the October 8, 2019 letter to Lacoste identifying Hudson Insurance Company and steering Lacoste into the bond-recovery track, thus leveraging DMV's flawed "consumer victim" narrative based on the mischaracterized ROS and missing complaint. That letter set in motion bond and lawsuit activity that further entrenched DMV's flawed story and was later ratified by DMV discipline. Defendants Humphreys, Berry, and Maiorana, acting as "Attorneys for Complainant," drafted, signed, and prosecuted the Accusation and related pleadings that: a. relied on the mischaracterized July 6 Wrap District / Arash ROS as if it proved a consumer sale to Lacoste; b. omitted the foundational complaint; and c. sought license revocation and adverse findings without squarely presenting the three-transaction record, the stolen-vehicle / recovery evidence, the Fast Auto payoff / lien-release / bond sequence, or the conflicting registration history to a neutral decisionmaker. Defendant Chapman, acting as DMV decisionmaker, signed and issued the default Decision and Order revoking Plaintiff's dealer license and plates based on the distorted narrative and incomplete record, thereby converting those defects into official, enforceable state action that is still

FIRST AMENDED COMPLAINT

being given effect and relied upon today. As a direct and proximate result of the foregoing acts and omissions, Plaintiff's license and plates were revoked, his dealer operations were effectively destroyed, his ownership and registration status for the BMW i8 were corrupted, and he was cast in official records as a wrongdoer, fueling:

- o   bond claims and collection suits anchored in DMV's flawed narrative;

- o   fraudulent ownership and theft claims by Zvily;

- o   Plaintiff's arrest and $10,000 bond obligation in Nevada; and
- o   insurance determinations by AAA portraying Plaintiff as having "sold and waived all rights" despite the conditional, disputed posture of the November 9, 2019, agreement, the Fast Auto payoff/lien-release, the Western Surety defective-title bond, and the LAPD Topanga release.

67.
The procedures employed by the Individual Defendants, viewed in their totality, did not provide the process that was due under the Fourteenth Amendment. Among other things, Plaintiff had no fair notice of the actual complaint; no meaningful opportunity to contest the mischaracterized ROS and three-transaction chain; no hearing or timely review before the late-February 2020 "new owner reported" title/registration change in favor of Zvily; and no neutral, record-based avenue within DMV to correct these defects once the downstream harms (arrest, bond, bond payouts, insurance denials) materialized. The Individual Defendants' conduct was objectively unreasonable, arbitrary, and deliberately indifferent to Plaintiff's constitutional rights. They knew or should have known that changing ownership and discipline records in this posture— while omitting the complaint and mischaracterizing the ROS, and while requiring but then effectively bypassing a defective-title bond—would predictably cause cascading harms once those records were exported to other systems. By reason of the foregoing, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial, including lost business and income, lost dealer operations, out-of-pocket costs (including bail and legal expenses), reputational harm, and emotional distress. Plaintiff seeks compensatory damages and, where legally permitted, punitive damages against the Individual Defendants in their individual capacities.

SECOND CLAIM FOR RELIEF
(42 U.S.C. § 1983 – Prospective Declaratory and Injunctive Relief / Ex parte Young)(Against the DMV Director in Official Capacity Only)

68.
Plaintiff realleges and incorporates by reference all preceding paragraphs of this First Amended Complaint as though fully set forth herein. Plaintiff brings this claim against the Director of the California Department of Motor Vehicles in official capacity only, for prospective declaratory and injunctive relief under Ex parte Young, to halt and remedy ongoing constitutional violations arising from DMV's maintenance, use, and

FIRST AMENDED COMPLAINT

31

export of materially defective license and VIN records concerning Plaintiff and the BMW i8. As alleged above, DMV's official records presently: a. reflect a default disciplinary decision and license revocation in In re 3RAW Inc., Case No. 20-02069, that was premised on a missing complaint and a mischaracterized ROS; b. reflect adverse title and registration entries (including a February 26, 2020 "new owner reported" event and subsequent registration in Zvily's name) processed without lawful authorization from Plaintiff and without constitutionally adequate notice and opportunity to be heard; and c. continue to be exported, certified, or relied upon by third parties as accurate statements of Plaintiff's status and ownership history. So long as DMV continues to maintain and treat these records as valid and enforceable, Plaintiff faces a real and immediate threat of ongoing and future harm, including:

- o continued reputational and professional stigma;

- o impaired ability to operate in the vehicle, credit, and insurance markets;

- o risk that law enforcement, courts, insurers, and bond/collection entities will again treat the defective DMV records as proof that Plaintiff lacks ownership or has engaged in wrongdoing; and

- o chilling of Plaintiff's ability to pursue legitimate dealer, licensing, and transportation-related activities.

**69.**
An actual, present controversy exists within the meaning of 28 U.S.C. §§ 2201–2202 as to whether DMV may constitutionally:
- o continue to enforce and rely upon the default decision and revocation in Case No. 20-02069;
- o continue to treat the February 26, 2020 "new owner reported" title event and subsequent Zvily registration as valid against Plaintiff; and
- o continue to export and certify these records as accurate representations of Plaintiff's legal status and the BMW i8's ownership history.

**70.**
Plaintiff seeks prospective relief requiring the DMV Director, in official capacity, to: a. cease treating the default Decision and Order in Case No. 20-02069 as valid discipline as to Plaintiff unless and until DMV affords constitutionally adequate process correcting the missing complaint and mischaracterized ROS; b. identify, preserve, and produce the underlying complaint, ROS, title applications, supporting documents, and notice logs relating to the BMW i8 and the February 26, 2020 "new owner reported" event; c. correct or annotate Plaintiff's DMV records and the BMW i8 VIN record to remove or neutralize the unconstitutional effects of the defective discipline and ownership

FIRST AMENDED COMPLAINT

32

entries, including the late-February 2020 "new owner" and subsequent Zvily registration; and

d. implement reasonable procedures to ensure that, going forward, similar license and VIN record changes affecting Plaintiff are not made without adequate notice, opportunity to be heard, and a reliable, transparent evidentiary basis.

**71.**

Declaratory and injunctive relief is necessary and appropriate to prevent the continuing and threatened violation of Plaintiff's constitutional rights and to ensure that DMV's official records no longer operate as a self-perpetuating source of harm.

**THIRD CLAIM FOR RELIEF**

**(Declaratory Judgment – 28 U.S.C. §§ 2201–2202 – Invalidity / Voidness of Specific DMV Actions and Entries)**

**(Against All Defendants in Their Official Capacities to the Extent Necessary for Declaratory Relief)**

**72.**

Plaintiff realleges and incorporates by reference all preceding paragraphs of this First Amended Complaint as though fully set forth herein. An actual, justiciable controversy exists between Plaintiff and Defendants regarding the validity and legal effect of specific DMV actions and entries, including: a. the Accusation and default Decision and Order in In re 3RAW Inc., Case No. 20-02069; b. the February 26, 2020 "Title issued or updated – New owner reported" transaction and any related title entries naming Zvily as "Owner 4" of the BMW i8; and c. the subsequent validated registration card listing Zvily as registered owner, which rests on the February 2020 ownership-change posture. Plaintiff contends, and Defendants dispute, that these DMV actions and entries are void or voidable as applied to him because they were: a. issued or processed without constitutionally adequate notice and opportunity to be heard; b. predicated on a missing jurisdictional complaint and a mischaracterized ROS; c. inconsistent with DMV's own August 7, 2019 registration card listing Plaintiff as registered owner and with the dealer wind-down / bonded-title posture; and d. implemented in a manner that foreseeably caused Plaintiff's downstream arrest, bond obligations, bond payouts, and insurance denials.

Plaintiff seeks a judicial declaration that: a. the default Decision and Order in Case No. 20-02069, as presently maintained and applied, violates Plaintiff's rights under the Fourteenth Amendment and is void or unenforceable as to him absent a constitutionally adequate re-hearing or other cure; b. the February 26, 2020 "new owner reported" title entry and any subsequent title/registration entries in favor of Zvily are invalid and cannot be given preclusive or conclusive effect against Plaintiff's ownership or property interests, because they were processed without lawful authorization and without due process; and c. the continued export and use of these defective DMV entries in criminal, civil, bond, and insurance contexts violates Plaintiff's constitutional rights and must be corrected, annotated, or neutralized by

FIRST AMENDED COMPLAINT

33

DMV. A declaratory judgment under 28 U.S.C. §§ 2201–2202 will serve a useful purpose in clarifying and settling the legal relations at issue and will afford relief from the uncertainty, insecurity, and controversy created by DMV's current records.

140.   Plaintiff therefore requests that the Court enter judgment declaring the above DMV actions and entries unconstitutional and invalid as to him, and awarding such further or additional relief as the Court deems proper, including associated injunctive orders as requested in the Second Claim for Relief.

## VIII.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff LORD MAISON PHIBONACCII respectfully prays that judgment be entered in his favor and against Defendants as follows:

A. As to the First Claim for Relief (42 U.S.C. § 1983 – Procedural Due Process), an award of compensatory damages against the Individual Defendants – ELIZABETH G. HUMPHREYS, JENNIFER BERRY, GAIL MAIORANA, JOSEPH CHAPMAN, MICHAEL CRAIG BREMER, SERGEANT JOHN J. BARTOLONE #319, and DOES 1–10 – in their individual capacities, in an amount to be proven at trial, for:

- o Loss of dealer operations, business opportunities, and income associated with the revocation of 3RAW INC's dealer license and plates;
- o Loss and impairment of Plaintiff's ownership and possessory interests in the 2016 BMW i8 (VIN WBY2Z2C52GV675765);
- o Financial losses arising from bond/collection actions, bail, criminal-defense posture, and related expenses;
- o Reputational harm, stigma, and impairment of Plaintiff's ability to work and transact in vehicle, finance, and insurance markets; and

Emotional distress and other non-economic damages.

An award of punitive damages, where permitted by law, against each Individual Defendant in his or her personal capacity, in an amount sufficient to punish and deter similar constitutional violations in the future. As to the Second and Third Claims for Relief (Declaratory and Injunctive Relief / Ex parte Young), declaratory judgments that: The DMV disciplinary proceedings and default Decision and Order in In re 3RAW Inc., Case No. 20-02069, as presently maintained and applied, violated Plaintiff's rights to procedural due process under the Fourteenth Amendment to the United States Constitution; The February 26, 2020 "Title issued or updated – New owner reported" transaction and any subsequent title/registration entries purporting to make non-party Nisim Zvily the "new owner" or registered owner of the BMW i8 are invalid and unenforceable as against Plaintiff's ownership and property interests because they were processed without lawful authorization and without constitutionally adequate notice and opportunity to be heard; and DMV's continued export, certification, and reliance on these defective records – including the discipline in Case No. 20-02069 and the late-February 2020 ownership entries – operates to deprive

Plaintiff of property and liberty interests without due process of law. Preliminary and permanent injunctive relief directing the DMV Director, in official capacity, to: Preserve and produce the complete administrative record for In re 3RAW Inc., Case No. 20-02069, and the complete VIN/title/registration history for the BMW i8, including the original triggering complaint (if any), all ROS/QuickTags records, title applications, supporting documents, internal notes, overrides/holds, and notice mailings/returns;

- Establish and provide a meaningful notice-and-hearing process for Plaintiff regarding the challenged disciplinary findings and the disputed BMW i8 ownership/title/registration entries, consistent with the Fourteenth Amendment;
- Correct and/or annotate DMV's internal and external records for Plaintiff and for the BMW i8 to remove, neutralize, or clearly flag the unconstitutional effects of: a. the default Decision and Order in Case No. 20-02069; and b. the February 26, 2020 "new owner reported" entry and any related title/registration entries in favor of Zvily;
- Implement reasonable safeguards, training, and procedures to ensure that, in bonded-title / dealer wind-down dispute postures, DMV does not process or maintain adverse ownership changes without valid authorization, appropriate verification, and constitutionally adequate notice and opportunity to be heard; and Take such further prospective administrative steps as are reasonably necessary to mitigate and repair the continuing effects of the defective DMV records and procedures on Plaintiff's property and liberty interests.

E. An award of Plaintiff's costs of suit pursuant to 28 U.S.C. § 1920 and other applicable law. An award of any attorneys' fees and expenses available under 42 U.S.C. § 1988 or any other applicable fee-shifting statute, to the extent Plaintiff later obtains counsel or otherwise becomes eligible for such relief. G. An award of pre-judgment and post-judgment interest at the maximum rate permitted by law. Such other and further legal and equitable relief as the Court deems just and proper.

**IX.**

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  March 2, 2026



Lord Maison Phibonaccii.
Plaintiff In Propria Persona

FIRST AMENDED COMPLAINT
